# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CERESSE MILNER,
     Plaintiff,

     v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,
     Defendant.

No. 3:18-cv-01276 (SRU)

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In this Social Security appeal, Ceresse Milner ("Milner") moves to reverse the decision

by the Social Security Administration ("SSA") denying her claim for disability insurance

benefits or, in the alternative, to remand the case for additional proceedings. Mot. to Reverse,

Doc. No. 21. The Commissioner of the Social Security Administration[1] ("Commissioner")

moves to affirm the decision. Mot. to Affirm, Doc. No. 22. For the reasons set forth below,

Milner's Motion to Reverse (doc. 21) is **denied** and the Commissioner's Motion to Affirm (doc.

no. 22) is **granted**.

## I.    Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708

F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the

claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373

n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not

working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e.,

an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.*

---

[1] The case was originally captioned "Ceresse Milner v. Nancy A. Berryhill, Acting Commissioner of Social Security." Since the filing of the case, Andrew Saul has been appointed the Commissioner of Social Security.

(citing 20 C.F.R. §§ 404.1520(c), 404.1521).  Third, if the claimant does have a severe impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations.  *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record."  *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)).  "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment."  *Id.*  Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work."  *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)).  Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy."  *Id.* (20 C.F.R. §§ 404.1520(g), 404.1560(b)).  The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria.  *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry.  *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418.  If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five.  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).  At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity."  *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled.  *Brault v. Soc.*

*Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374–75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447–48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.     Facts

Milner applied for Social Security disability insurance benefits on May 7, 2015, alleging that she has been disabled since June 1, 2014. Disability Benefits App., R. at 211. Milner filed her disability claim based on her history of type one diabetes and mental health disorders. *See* Disability Determination Explanation, R. at 109.

The SSA initially denied Milner's claim on July 27, 2015, finding that although Milner's "condition results in some limitations in [her] ability to perform work related activities . . . . We have determined that [her] condition is not severe enough to keep [her] from working . . . . [B]ased on the evidence in file, we have determined that [Milner] can adjust to other work." *Id.* at 121. In the agency's view, Milner was not disabled. *Id.* Milner sought reconsideration, but the SSA adhered to its initial decision on November 1, 2015. Disability Determination Explanation (Reconsideration), R. at 135–36.

Milner requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September 29, 2016. *See* Tr. of ALJ Hr'g, R. at 32. At the time of the hearing, Milner was 27 years old and her highest level of education was high school. *See id.* at 41–42. During the hearing, ALJ Eric Eklund questioned Milner regarding her employment and medical history. *Id.* at 45. He first asked Milner about her current employment. Milner stated that she currently works around twenty hours a week, working part-time as a food demonstrator at Costco and a cashier at Taco Bell. *See id.* at 45–47. When asked what was the "biggest problem" she faces at work, Milner testified that she has difficulty working for prolonged periods because she sometimes feels like she is "about to pass out" when "[her] [blood] sugar is just like out of control." *Id.* at 48. She also noted that she occasionally has knee pain from an injury she suffered when she was in 9th grade. *Id.*

ALJ Eklund inquired more about Milner's symptoms relating to her diabetes. *Id.* at 51. Milner testified that she has trouble working because "sometimes it feels like [her] feet are on fire" due to poor circulation. *Id.* She also stated that her diabetic neuropathy affects her ability to sit, stand, and walk. *Id.* at 50. "The longest that I can stand is probably like a half an hour . . . . So I try and sit down whenever I can." *Id.* at 53. Milner repeated noted that she has trouble controlling her blood sugar levels. *See id.* at 52. "Even when I was in the hospital, when I was pregnant with my daughter . . . they couldn't control my [blood] sugars." *Id.*

Regarding Milner's mental health, ALJ Eklund asked Milner about her history of depression, anxiety, and post-traumatic stress disorder ("PTSD"). *Id.* at 54. Milner noted that she is taking medication to control her depression, but "[hasn't] had to leave work" because of it. *Id.* She also testified that oftentimes her anxiety makes it difficult for her to function at work

because she gets "irritated and annoyed a lot." *Id.* at 56. Milner stated that her PTSD is directly related to recently losing custody of her children. *Id*. at 57.

Finally, ALJ Eklund questioned Milner about her lifestyle. Milner testified that she currently lives with her step-bother, who does most of the house chores and grocery shopping. *Id*. at 58. Milner occasionally cooks and reported having no problems showering or bathing. *Id*. at 59. She testified that the most challengingly part of her life is "moving around [and] getting to places that [she] need[s] to go." *Id.* at 62.

ALJ Eklund then called a vocational expert, Elaine Cogliano ("Cogliano"). *Id*. at 65. The parties reviewed Milner's past work history, which includes retail employment at Radio Shack, Target, and working as a sous chef at Holiday Inn. *See id.* at 66–69. ALJ Eklund asked Cogliano to "assume a hypothetical individual" of Milner's age, education, and work experience. *Id.* at 71. He asked Cogliano to assume further that the individual was limited to light work and only "occasionally climb[s] ladders, ropes, or scaffolds" and "occasional[ly] [climbs] ramps and stairs." *Id*. In addition, the hypothetical individual would be limited to "simple, unskilled work, only occasional interaction with the public, only occasional interaction with co-workers, no tandem tasks, [and] only occasional supervision." *Id*.

Cogliano opined that "[a]ccording to that hypothetical, the individual would not be able to perform past work, but could do other work in the local or national economy." *Id*. The "other work" Cogliano identified included: (1) a "packaging position," with 65,000 jobs available nationally, (2) an "inspector position," with 58,000 jobs available nationally, and (3) an "office helper position," with 75,000 jobs available nationally. *Id.* When the ALJ classified the hypothetical person as "sedentary," Cogliano opined that the packing and inspector positions

would remain available,[2] in addition to a "sorter position," with 40,000 jobs available in the national economy. *Id.* at 72. Finally, ALJ Eklund asked Cogliano that if the hypothetical person "would require frequent unscheduled breaks, would miss three days of work per month, [and] would be off task up to 15% of the workday . . . what affect would that have on the ability to work?" *Id.* Cogliano responded that "[a]ccording to that hypothetical, the person would not be employable. There would be no jobs they could perform." *Id.*

On June 21, 2017, ALJ Eklund issued a written opinion, finding that Milner "ha[d] not been under a disability defined in the Social Security Act, from June 1, 2014, through the date of this decision[.]" ALJ Decision, R. at 25. At the first step, ALJ Eklund found that "[t]here has been a continuous 12-month period [] during which Milner did not engage in substantial gainful activity." *Id.* at 14. At the second step, he determined that within the past year, Milner had the following severe impairments: depressive/dysthymic disorder, anxiety disorder, personality disorder, PTSD, type one diabetes mellitus with neuropathy, and recurrent muscle spasms. *Id.* ALJ Eklund noted that "[t]he above medically determinable impairments significantly limit [Milner's] ability to perform basic work activities." *Id.* At the third step, ALJ Eklund determined that Milner's impairments were not per se disabling because Milner "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" *Id.*

Regarding Milner's physical impairments, ALJ Eklund found "insufficient support" in the record to establish that Milner's type one diabetes rose to the level of a per se disabling severe impairment as defined under the SSA's regulations.[3] *Id.* at 15. He noted that "[w]hile

---

[2] Albeit in lower numbers, with 35,000 jobs available nationally for the packing position, and 34,000 jobs available nationally for the inspector position. *See* Tr. of ALJ Hr'g, R. at 72.
[3] Regarding Milner's diabetes mellitus, ALJ Eklund stated that "[a]lthough the regulations no longer provide a specific listing for diabetes mellitus, I nonetheless considered whether [Milner's] type one diabetes could rise to the

[Milner] does suffer from diabetes mellitus, this is a longitudinal condition dating back to age nine, which the claimant has managed for a number of years. Although her blood sugars are still occasionally poorly controlled, this occurs only rarely, and in the context of failing to take insulin for a few days." *Id.* at 20.

Regarding Milner's mental impairments, ALJ Eklund found that she has a "moderate limitation" in "understanding, remembering, or applying information" and "interacting with others." *Id.* at 15. "Subjectively, [Milner] alleges that she spends no time with others and that certain things may get on her nerves . . . During the regular course of treatment, [Milner] consistently presents as pleasant and cooperative, with no specific interpersonal deficits noted." *Id.*

At step four, ALJ Eklund assessed Milner's residual functional capacity ("RFC") and found that she could "perform light work . . . except she could occasionally climb ladders, ropes, scaffolds, ramps, and stairs" and "occasionally crawl . . . [and] occasionally operate foot controls." *Id.* at 16. Milner would be further limited to "simple, unskilled work," where "she could have only occasional interaction with the public, co-workers, and supervisors" and "could not perform tandem tasks." *Id.* In addition, Milner would be limited to "no exposure to extreme cold, moving machinery on the work floor, or unprotected heights." *Id.*

Although Milner's RFC rendered her "unable to perform any past relevant work," ALJ Eklund determined that considering Milner's "age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that [Milner] [could] perform." *Id.* at 23–24. Therefore, ALJ Eklund concluded that Milner "ha[d] not been under a disability, as

_____

level of a listing in accordance with the criteria set forth in SSR 14-2p. However, I find insufficient support for such a finding in the objective medical evidence of record." ALJ Decision, R. at 15.

defined in the Social Security Act, from June 1, 2014, through the date of this decision." *Id*. at 25.

Milner requested a review of the ALJ's decision by the SSA's Appeals Council on August 13, 2017. *See* Request for Review of Hearing Decision, R. at 210. By letter dated June 1, 2018, the Appeals Council denied Milner's request for review, stating that "[w]e found no reasons under our rules to review the Administrative Law Judge's decision. Therefore, we have denied your request for review." Appeals Council Denial, R. at 1. Milner, filed a complaint with this court on August 1, 2018, requesting that I reverse the Commissioner's decision, or remand for further administrative proceedings. *See* Compl., Doc. No. 1.

## III. Discussion

On appeal, Milner argues that the ALJ's decision was not supported by substantial evidence. *See* Mem. in Supp. Mot. to Reverse, Doc. No. 21-1 at 4. Specifically, she contends that the ALJ erred by (1) affording "limited weight" to the medical opinions of her treating primary sources and consultative examiner, (2) failing to comment on all of her medical records in connection with her physical impairments, (3) failing to consider the side effects of her medication, and (4) failing to properly determine her RFC in light of her physical and mental limitations as described in the record. The Commissioner responds that the ALJ's decision was "supported by substantial evidence and complies with the applicable legal standards." Mem. in Supp. Mot. to Affirm, Doc. No. 22-1 at 13.

### A. Did the ALJ make improper weight assessments?

Milner argues that the ALJ failed to properly assess the weight of various health care providers in violation of the Treating Physician Rule. *See* Mem. in Supp. Mot. to Reverse at 2–4. Specifically, Milner argues that ALJ Eklund: (1) erred in assigning only "limited weight" to

the opinions of treating physician Dr. S. M. Madonick, (2) erred in assigning only "limited weight" to the opinions of treating therapist Jennifer Schmitt, and (3) erred in assigning only "limited weight" to Dr. Philip Cardamone, her post-hearing consultative examiner. The Commissioner asserts that "the ALJ properly weighed the opinion evidence of record." Mem. in Supp. Mot. to Affirm at 2.

"The treating physician rule provides that an ALJ should defer to 'to the views of the physician who has engaged in the primary treatment of the claimant,'" but need only assign those opinions "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record."[4] *Cichocki v. Astrue*, 534 F. App'x 71, 74 (2d Cir. 2013) (summary order) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. § 404.1527(c)(2)). When the ALJ "do[es] not give the treating source's opinion controlling weight," he must "apply the factors listed" in SSA regulations, 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418. After considering those factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion," *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004), and provide "good reasons" for the weight assigned. *Burgess v. Astrue,* 537 F.3d 117, 129 (2d Cir. 2008).

---

[4] Originally a rule devised by the federal courts, the treating physician rule is now codified by SSA regulations, but "the regulations accord less deference to unsupported treating physician's opinions than d[id] [the Second Circuit's] decisions." *See Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

The Second Circuit has held that "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." *Id.* at 128. For example, an expert's opinion is "not substantial, i.e., not reasonably capable of supporting the conclusion that the claimant could work where the expert addressed only deficits of which the claimant was not complaining, or where the expert was a consulting physician who did not examine the claimant and relied entirely on an evaluation by a non-physician reporting inconsistent results." *Id.* (internal citations and quotations omitted).

The Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," and has advised that, ordinarily, "a consulting physician's opinions or reports should be given little weight." *Selian*, 708 F.3d at 419; *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). The question here is whether the ALJ sufficiently provided "good reasons" for weighing the opinions of the consultative physicians more heavily than the opinions of Milner's treating physicians. *See Burgess*, 537 F.3d at 129.

In his decision, ALJ Eklund found that the "severity of [Milner's] physical impairments, considered singly and in combination, does not meet or medically equal the criteria of any impairment listed in the regulations." ALJ Decision, R. at 15. In addition, he noted that "[a]lthough [Milner] subjectively alleges significant symptoms and work-related functional limitations from her combination of mental impairments, the record as a whole fails to support her alleged limitations as described . . . . [Milner's] borderline intellectual functioning and [her] cognitive deficits . . . could reasonably limit her to unskilled work as detailed in the [RFC][.]" *Id*. at 18. Therefore, ALJ Eklund concluded that it is "reasonable to restrict [Milner] to a range of light-exertional work . . . . [F]urther erosion of the occupational base is not warranted by the record." *Id.* at 20.

1. *Dr. Madonick*

Milner first argues that the ALJ failed to assign proper weight to the opinions of Dr. Madonick, whom Milner contends, is her treating physician. *See* Mem. in Supp. Mot. to Reverse at 3. "[Dr. Madonick] and [Schmitt] both opined that [Milner] was incapable of substantial gainful activity or work on a regular basis." *Id.* at 2. In response, the Commissioner argues that Milner "does not point to any evidence that Dr. Madonick was her 'primary physician,' or that he had even examined her. Instead, a review of the cited records from Community Health Resources [CHR] reveals that [Schmitt] (a therapist) authored and signed the treatment notes and treatment plan, and Dr. Madonick later signed off as [Schmitt's] supervisor." Mem. in Supp. Mot. to Affirm at 3.

I conclude that the ALJ did not err in his assessment. Contrary to Milner's assertion, ALJ Eklund did not afford "limited weight" to Dr. Madonick's opinions. Instead, he assigned "limited weight" to the opinions of Milner's treating therapist, Jennifer Schmitt [Schmitt], a Licensed Clinical Social Worker whose notes were approved and co-signed by Dr. Madonick. *See* ALJ Decision, R at 22. ("I also afford limited weight to the June 2015 [report] of [Milner's] treating source Jennifer Schmitt, LCSW, co-signed by Dr. Madoneck [sic], which finds that [Milner] would have limited to no abilities in a number of functional domains . . . .").

It is not apparent from the record whether Dr. Madonick ever personally examined Milner. The records documenting her treatment at CHR indicate that she was personally examined by Schmitt and by APRNs Wykelsha Highsmith and Kate LeBlanc, whose notes and treatment plans were "[a]pproved by" Dr. Madonick. *See, e.g.,* CHR Treatment Records, R. at 478 ("Supervisor's Signature: Approved by SMADONICK on 1/15/15."). Those notes, however, do not specify the degree to which Dr. Madonick treated her. To the extent that Milner argues that Dr. Madonick is her "primary physician" because "his name is all over [her]

treatment records," that argument is not consistent with her treatment notes, which were primarily authored by Schmitt and later approved by her supervisor, Dr. Madonick. Mem. in Supp. Mot. to Reverse at 3. Thus, the ALJ did not err in his assessment of Dr. Madonick's opinions because Dr. Madonick did not directly opine on Milner's physical and mental impairments.

## 2. *LCSW Schmitt*

Milner also argues that the ALJ erred in affording only "limited weight" to the opinions of Schmitt, Milner's treating therapist. *See id.* at 3. "[Schmitt] indicated that [Milner] had limited ability in carrying out simple step instructions . . . [and] performing basic activities at a reasonable pace and persisting in simple activities without interruption from psychological symptoms." *Id.* at 2–3. The Commissioner responds, stating that "although [Schmitt] had treated [Milner] weekly since March 2013, the restrictive opinion rendered in June 2015 was not well supported and was inconsistent with other record evidence, including the objective findings and other treatment observations." Mem. in Supp. Mot. to Affirm at 4.

Schmitt began seeing Milner on a weekly basis at CHR on March 18, 2013, to treat Milner's anxiety and PTSD. *See* Schmitt 2015 Mental Assessment, R. at 456. Throughout her consultations, Schmitt noted that Milner continued to exhibit "[s]ymptoms of anxiety and depression [that] interfere with [her] social role, employment, health and/or well-being." Schmitt 2015 Treatment Notes, R. at 486.

On June 5, 2015, Schmitt prepared a mental impairment questionnaire co-signed by Dr. Madonick, regarding Milner's disability benefits application. *See* Schmitt 2015 Mental Assessment, R. at 456. In her report, Schmitt opined that Milner "[was] experiencing anxiety due to DCF taking one [of her] child[ren] into their custody." *Id.* She also opined that Milner's

mood was "generally irritable," and that she "comes off as hostile . . . which is a symptom of trauma." *Id*. at 457. Schmitt rated Milner's social interactions as "[a]lways a problem" and rated her task performance as "[f]requently a problem." *Id*. at 459.

In his written decision, ALJ Eklund afforded "limited weight" to Schmitt's opinions for three reasons. *See* ALJ Decision, R. at 22. First, as a Licensed Clinical Social Worker, Schmitt is not an acceptable medical source, despite her lengthy treatment history with Milner. "Although her form is co-signed by an acceptable medical source [Dr. Madonick], this alone is an insufficient reason to afford the opinion greater weight." *Id.* Second, "her [2015 Mental Assessment] cites to [Milner's] symptoms, but not [to] any specific objective testing or treatment observations to support the substantial limitations as described." *Id.* Third, Schmitt's statement that Milner "would struggle with even simple tasks due to [her] symptoms is inconsistent with [her] history of semi-skilled and skilled work." *Id.*

After reviewing the record, I conclude that the ALJ properly weighed Schmitt's medical opinions. As noted by the Commissioner, "[a]lthough the ALJ is obligated to at least consider the opinions of sources who are not 'acceptable medical sources,' the ALJ is not required to provide an explanation of his consideration of every factor." Mem. in Supp. Mot. to Affirm 4 (citing 20 C.F.R. §§ 404.1527(f) and 416.927(f)). In this case, Schmitt's restrictive opinions rendered in her 2015 Mental Assessment are not well supported by the objective evidence in the record. For example, although Schmitt opined in June 2015 that Milner has "[n]o ability" to interact appropriately with others or get along with people without distracting them, Milner was then working at Costco and Taco Bell, where she routinely interacted with co-workers without incident. *See* Schmitt 2015 Mental Assessment, R. at 459; Tr. of ALJ Hr'g, R. at 46–48. In her treatment notes dated January 13, 2015, Schmitt reported that Milner exhibited

mild or no impairments in most daily living activities.  *See* Schmitt, 2015 Treatment Notes, R. at

476–77.  Despite her June 2015 opinion that Milner "struggles with taking care of her

grooming," Schmitt consistently graded Milner as having "no impairment or problem" with

"[p]ersonal [h]ygeine" or "[g]rooming."  Schmitt 2015 Mental Assessment, R. at 457; Schmitt

2015 Treatment Notes, R. at 476–77.

Therefore, I conclude that the ALJ did not err in assigning "limited weight" to Schmitt's

2015 Mental Assessment.

### 3.  *Dr. Cardamone*

Next, Milner contends that the ALJ erred by assigning "limited weight" to

Dr. Philip Cardamone, Milner's post-hearing consultative examiner.  *See* Mem. in Supp. Mot. to

Reverse at 4.  "[Dr. Cardamone] had findings consistent with [Milner's] primary treating sources

. . . . [He] found that [Milner's] borderline intellectual functioning and cognitive deficits would

limit the range of occupations that she could perform [] and that it was unlikely that [Milner]

would be able to perform over a full-time workweek."  *Id.*  The Commissioner contends that

contrary to Milner's assertions, Dr Cardamone observed that she was "well-mannered and

friendly, maintained good eye contact, and became motivated to do well after some friendly

cajoling."  Mem. in Supp. Mot. to Affirm at 8 (citing Dr. Cardamone 2016 Report, R. at 635).

Dr. Cardamone administered a single post-hearing psychological examination of Milner

on November 23, 2016.  *See* Dr. Cardamone 2016 Report, R. at 635.  In his report, Dr.

Cardamone opined that Milner had "extreme difficulty coping with her physical problems and

[was] affected by severe and persistent symptoms of major depression."  *Id.* at 636.  He noted

that Milner's IQ score of 79 ranked in the 8th percentile.  *Id*. at 635.  Although she ranked in the

63rd percentile in her ability to reverse digits, she ranked in the 2nd percentile in her ability to do

mental arithmetic.  *Id.* at 635–36.  Dr. Cardamone concluded that Milner was "passive, lacks autonomy, and is dependent on others for guidance" and "does not appear to be able to tolerate a full time work week[.]"  *Id*. at 636–37.

In his written decision, ALJ Eklund afforded "limited weight" to Dr. Cardamone's 2016 report.  *See* ALJ Decision, R. at 21.  First, he noted that Dr. Cardamone has a limited treatment history with Milner and therefore lacks "knowledge of her impairments over time."  *Id*. at 22.  Secondly, he questioned whether Dr. Cardamone reached his conclusions "independently, based upon his own observations . . . or rather whether he was re-stating what [Milner] said, as supported by language like 'as she described it[.]'"  *Id.*  (quoting Dr. Cardamone 2016 Report, R. at 637).  Third, ALJ Eklund stated the concerns Dr. Cardamone expressed in his 2016 report are fully accounted for in her RFC.  *See id.*

Here, the ALJ did not err in his weight assessment of Dr. Cardamone's 2016 report.  At the outset, "the ultimate finding of whether a claimant is disabled and cannot work—[is] 'reserved to the Commissioner.'"  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (quoting 20 C.F.R. § 404.1527(e)(1)).  Secondly, Dr. Cardamone's opinions are consistent with the ALJ's RFC findings and with Milner's history of unskilled work during the relevant period.  Dr. Cardamone opined that Milner was "well oriented, alert, calm, and coherent" during her examination.  Dr. Cardamone 2016 Report, R. at 635.  Although her "overall intellectual functioning was within the borderline range of measured intelligence," Dr. Cardamone noted that Milner "if property motivated . . . can concentrate, at least in the short term."[5]  *Id*. at 635, 637.

---

[5] Those observations are consistent with other objective medical evidence in the record.  During a 2016 physical exam at Johnson Memorial Hospital, a health provider noted that Milner appeared "well-developed" and "oriented to person, place, and time."  Johnson Memorial Hospital 2016 Records, R. at 593.  During an October 2017 visit at CHR, Milner's therapist noted improvement in Milner's mental state.  *See* CHR 2017 Treatment Records, R. at 613 ("[Milner] reports less irritable, less depressed, improved sleep.").

ALJ Eklund properly considered the limitations presented in Dr. Cardamone's 2016 report in Milner's RFC finding. Dr. Cardamone's concern that Milner would not be able to withstand a full-time work week due to her mental impairments was accounted for in her RFC. *See* ALJ Decision, R. at 16 ("[Milner] would be further limited to simple, unskilled work; she could have only occasional interaction with the public, co-workers, and supervisors; and she could not perform tandem tasks."). Moreover, Dr. Cardamone recognized Milner's ability to retain-time employment. "[Milner] said she is employed part time at Taco Bell. She has variable hours. She has some occupational difficulties but is able to do most assigned tasks." Dr. Cardamone 2016 Report, R. at 633.

For the foregoing reasons, I conclude that the ALJ did not err in his weight assessment of Milner's primary treating sources and her post-hearing consultative examiner.

B. <u>Did the ALJ fail to properly consider the evidence regarding Milner's physical impairments?</u>

Milner also contends that the ALJ failed to comment on all of the medical records documenting her physical impairments. *See* Mem. in Supp. Mot. to Reverse, at 4. Specifically, Milner argues that ALJ Eklund made no mention of her medical records from Johnson Memorial and St. Francis Hospitals, which show that Milner made numerous visits for pain and numbness related to her diabetes. *Id.* "In regards to [Milner's] physical condition, the only record that the ALJ commented on was the Post Hearing opinion of a consultative examiner, Robert Dodenhoff, M.D., who had no treatment history" with Milner. *Id.* at 4–5. In response, the Commissioner asserts that "[t]he ALJ properly considered the evidence of record relating to [Milner's] diabetes with neuropathy and muscle spasms, found it to be a severe impairment at step two of the sequential evaluation, and assessed RFC limitations restricting [Milner] to a range of light work." Mem. in Supp. Mot. to Affirm, at 10.

The Second Circuit has stated that when "the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion [regarding] disability." *Heckler*, 722 F.2d at 1040 (citing *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)).

In this case, ALJ Eklund properly considered Milner's physical impairments, noting that her diabetic neuropathy was a severe impairment at step two. *See* ALJ Decision, R. at 14. He did not, however, consider her type one diabetes to be per se disabling under SSA Regulations. *See id.* at 14–15. In his decision, the ALJ noted that Milner's records indicate that she tends to suffer symptoms of her diabetes when she fails to take her medication as prescribed. *Id.* at 20. "During the period under review, [Milner's] symptoms only worsened when she did not take prescribed medication, such as an incident in summer 2016 when she stayed with a friend and did not take medication for three days [.]" *Id.* Therefore, ALJ Eklund concluded that it was "reasonable to restrict [Milner] to a range of light-exertional work . . . .[ F]urther erosion of the occupational base is not warranted by the record." *Id.*

The objective medical evidence in the record supports that finding. *See, e.g.*, Johnson Memorial Hospital 2016 Records, R. at 579 ("[T]his is a 27-year-old female diabetic who noticed since yesterday that when she is at work washing her dishes her hand swelled up and she was itching a lot . . . . She has no other complaints."); St. Francis Medical Group 2016 Records, R. at 491 ("[Milner] is here for evaluation of [diabetes mellitus] . . . reports no problems with feet . . . . has report of depression . . . . [Milner] without any other complaints related to diabetes at this time."); UConn Health Center 2011 Records, R. at 359 ("Significant amount of time was spent [] talking to her and her mother on how we can better control her sugars and the need for

her to be compliant about her medications.  She did not seem to be receptive about our suggestions.").

Because the ALJ is not required to mention "every item of testimony presented to him," I conclude that he did not err in failing to comment on all of Milner's medical records relating to her physical impairments.  *Heckler*, 722 F.2d at 1040.

C. Did the ALJ fail to consider the Milner's side effects?

Milner also contends that the ALJ failed to consider the side effects of her medication. *See* Mem. in Supp. of Mot. to Reverse at 5.  Milner, however, does not specify what type of side effects she experienced, nor does she allege how those side effects contributed to her physical and mental impairments.  The Commissioner argues that ALJ Eklund "properly considered the relevant factors when assessing [Milner's] allegations, including that [her] symptoms improved to some degree with treatment, including medication; and she maintained extensive activities of daily living, including part-time work[.]"  Mem. in Supp. of Mot. to Affirm at 12.

Because Milner does not specify any particular side effect she experienced, I conclude that the ALJ did not err in his assessment.

D. Did the ALJ accurately describe Milner's functional limitations when questioning the vocational expert?

Finally, Milner argues that the ALJ erred by failing to consider "the limitations that [she] possessed that would limit [her] ability to do the jobs cited [in her RFC assessment][.]"  Mem. in Supp. Mot. to Reverse at 6.  The Commissioner contends that Milner has "failed to establish – as was her burden – any additional RFC limitations beyond those found by the ALJ and conveyed to the vocational expert."  Mem. in Supp. of Mot. to Affirm at 12.

After a claimant has proved that his or her residual functional capacity precludes a return to "past relevant work," *Greek*, 802 F.3d at 373 n.2 (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)), there is a "limited burden shift" to the Commissioner to show that "there is work in the national economy that the claimant can do." *Poupore*, 566 F.3d at 306. The ALJ may carry that burden "either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). "A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations." *Hamilton v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 223, 229 (N.D.N.Y. 2015) (citing *Dumas*, 712 F.2d at 1553–54). For the vocational expert's testimony "to be considered reliable," however, "the hypothetical posed must include *all* of the claimant's functional limitations . . . supported by the record." *Horbock v. Barnhart*, 210 F. Supp. 2d 125, 134 (D. Conn. 2002) (quoting *Flores v. Shalala*, 49 F.3d 562, 570–71 (9th Cir. 1995)).

If the ALJ "ask[s] the vocational expert a hypothetical question that fail[s] to include or otherwise implicitly account for all of [the claimant]'s impairments," then "the vocational expert's testimony is not 'substantial evidence' and cannot support the ALJ's conclusion that [the claimant] c[an] perform significant numbers of jobs in the national economy." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1181 (11th Cir. 2011); *see also Lancaster v. Comm'r of Soc. Sec.*, 228 F. App'x 563, 573 (6th Cir. 2007) (unpublished) ("If the hypothetical question does not accurately portray Plaintiff's physical and mental state, [then] the vocational expert's testimony in response to the hypothetical question may not serve as substantial evidence in support of the ALJ's finding that Plaintiff could perform other work."); *Medovich v. Colvin*, 2015 WL 1310310, at *14 (N.D.N.Y. Mar. 23, 2015) ("[E]xpert vocational testimony given in

response to hypothetical questions that do not present the full extent of claimants' impairments, limitations[,] and restrictions . . . cannot constitute substantial evidence to support a conclusion of no disability."). In such circumstances, the ALJ's decision may be upheld only if the error was "harmless," that is, if other "substantial evidence in the record" supports the ALJ's conclusions. *See McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014; *cf. Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008).

In this case, I conclude ALJ Eklund fully incorporated Milner's physical and mental limitations when assessing her RFC. At the September 29, 2016 hearing, ALJ Eklund questioned Milner about her type one diabetes and her mental disorders. *See* Tr. of ALJ Hr'g, R. at 48–53, 54–58.[6] He then examined Cogliano and asked her to "assume a hypothetical individual" of Milner's age, education, and work experience, who was limited to, among other limitations, "light . . . simple, unskilled work, only occasional interaction with the public, only occasional interaction with co-workers, no tandem tasks, only occasional supervision." *Id.* at 71. In his June 21, 2017 written opinion, the ALJ properly relied on the Cogliano's testimony and concluded that there were a significant number of jobs available in the national economy that Milner could perform. *See* ALJ Decision, R. at 16, 24. As noted above, the ALJ's finding regarding Milner's RFC are consistent with the record. Accordingly, the ALJ did not err in the limitations assigned to Milner's physical and mental impairments.

---

[6] *See, e.g.,* Tr. of ALJ Hr'g, R. at 53 (Q: So diabetes is a problem. Got that. Physically, other than your diabetes is there any other physical, mechanical problems that you have, or is it primarily your knee and your diabetes? A: Just those.); *id.* at 54 (Q: Now in terms of psychological problems, you have a few issues. For you, which is the most significant issue that you've been seeking help for or getting treated? What's the major psychological problem for you that effects your life. A: The depression, the anxiety, and the PTSD.").

## IV.    Conclusion

For the reasons set forth above, Milner's Motion to Reverse (doc. no. 21) is **denied**, and the Commissioner's Motion to Affirm (doc. no. 22) is **granted**.  The Clerk shall enter judgment and close the case.

So ordered

Dated at Bridgeport, Connecticut, this 3rd day of October 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge